**SELECTASINE PATENTS CO. et al. v. PREST-O-GRAPH CO. et al.** *

(Circuit Court of Appeals, Ninth Circuit.    October 24, 1921.)

No. 3628.

Patents ⊚⇒328—1,254,764, for method of delineating or reproducing pictures and designs, held valid and infringed.

    The Owens, Beck & Steinman patent, No. 1,254,764, for method of delineating or reproducing pictures and designs in multicolors by the use of a screen, producing an embossed effect, as limited to the use only of a single screen, *held* not anticipated, valid, and infringed.

Hunt, Circuit Judge, dissenting.

Appeal and Cross-Appeal from the District Court of the United States for the District of Oregon; Charles E. Wolverton, Judge.

Suit in equity by the Selectasine Patents Company and another against the Prest-O-Graph Company and others. Decree for complainants with limitation of claims, and complainants appeal and defendants file cross-appeal. Affirmed.

For opinion below, see 267 Fed. 840.

Chas. E. Townsend, of San Francisco, Cal., and Cassius R. Peck, and Griffith, Leiter & Allen, all of Portland, Or., for appellants.

Joseph L. Atkins, Leicester B. Atkins, and Atkins & Atkins, all of Portland, Or., for appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. This suit was brought for the alleged infringement of certain letters patent relating to "method of delineating or reproducing pictures and designs."

The gist of the patented process, as we view it, is the building of color upon color in producing their multicolor picture designs, thereby producing a certain embossed effect. The nearest approach to anticipation shown by the record is the English patent to Simon, and we agree with the court below, for reasons stated in its opinion and which, therefore, need not be repeated, that the complainant's process was not anticipated by that of Simon. We think the Patent Office rightly held novel the process here claimed, and that it is highly useful is abundantly shown by the evidence.

That the defendants to the suit infringed by using the same process in the production of their designs and pictures—sometimes, it is true,

---

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing granted January 16, 1922.

by the use of a single screen and sometimes by the use of a plurality of screens—clearly appears from the record. In each instance the same process was used.

It is enough to say, in answer to the contention of the cross-appellees, that the injunction granted should have been extended to the use of a plurality of screens; that none of the claims of the patent sued-on covered more than one screen.

The judgment is affirmed.

HUNT, Circuit Judge (dissenting). The patent is for a method of delineating or reproducing pictures and designs. In the specification the patentee stated that the object of his invention is "to provide a method whereby a picture or design containing one or more colors may be delineated or reproduced on smooth surfaces * * * such as paper, cardboard, * * * fabrics, etc., without the use of engraved plates of any kind." The method and operation are briefly as follows:

Having the original sketch to be reproduced, there is a card of a solid color upon which card the multicolored sketch is to be reproduced by the process. There is an open mesh screen of bolting or other suitable cloth tightly stretched on a rigid frame, the screen to be of a size to be superimposed on the sketch to be reproduced. The stretched screen is laid on the master pattern and the outlines of all that portion of the master pattern shown in a solid color and which tones are to be preserved in the reproduction are traced on the screen. These traced portions are then painted over with shellac or a filler to prevent any paint going through. The effect is to protect the base color and thus permit the original color to appear through all successive color runs. The meshes may also be closed by masks or stencils cut from paper or other suitable material. When a color is to be applied the card is placed below the screen or stencil frame so as to procure a perfect register between the card and the frame. The color is poured on the screen surface and forced through the meshes that are not blocked out by passing a scraper or roller, called a "squeegee," over the surface of the screen. Thus the color is forced evenly through the meshes of the cloth screen and adheres to the surface of the card and covers the parts devised. After the first color has been applied, it is necessary to change the stencil to permit the application of the next color. This is done by washing the stencil frame with a solvent which will not affect the protective material; that is, the masks of a previous run remain throughout the operation, and the entire screen except the area for the last color applied is eventually blocked out. The screen is laid on the master pattern and a tracing made on the screen for another color to appear; again masking is resorted to; and this method is repeated for the next color until all colors in the original drawing have been run.

In the application of each color there is a partial overlay; the several colors being superposed in distinct layers, one on top of the other. The patentee specifies that this is of great importance, as it "permits not only a natural modeling and embossing of all designs, but also a

clean-cut margin line and perfect register of all colors." The finished product is given an embossed or built-up appearance, what is spoken of as a plateau effect, and which appealed at once to the public as useful for advertising purposes.

The patentee also stated that the method may be applied in the form of a separate stencil for each color constructed as already described and so arranged that each will register in its proper place to register with preceding colors. "Both plans are part of this method."

Of the ten claims of the patent, typical ones are:

"1. A method of producing multicolored pictures or designs which comprises successively forcing a plurality of colors through a single screen which is partly blocked out after each color run in such a way that at least a part of a succeeding color will extend over part of a preceding color."

"3. A method of producing multicolored pictures or designs having embossed portions which comprises successively forcing a plurality of comparatively thick colors through a single screen which is partly blocked out after each color run in such a way that one or more succeeding colors will at least partly overlay a preceding color."

"9. A method of producing multicolored pictures or designs having embossed portions and clean-cut margin lines which consists in tracing on a screen covered frame from an original which it is desired to reproduce, the outline of a color which it is desired to first apply, blocking out all the surface exterior of the traced lines by filling in with shellac or other material, then placing the screen on the surface upon which the color is to be applied, depositing paint thereon and forcing it through the open meshes of the screen by running a flexible scraper over the screen, again tracing on said screen an outline for a second color and blocking out the remaining surface to cause the second color, when forced through the screen, to partly overlay the first, then proceeding with each individual color until all are applied.

"10. A method of reproducing multicolored pictures which comprehends the application of successive colors making up the picture to be reproduced upon a surface to be treated, through the medium of a tightly stretched screen maintained in close contact with the surface to be treated while a particular color is being applied by means of a squeegee, each color being applied through a partly different portion of the screen from that through which any other color is applied, and blocking out on the screen each successive color area after the preceding color has been applied through the screen so as to render a part of the previously permeable portion of the screen impermeable to the succeeding color runs."

In arriving at a proper construction to be placed upon the claims of the patent, we must consider the action of the Patent Office upon the original application of the patentee, and also examine the prior art. When the patentees first applied for patent, they sought the allowance of three claims as follows:

"1. The herein described method of delineating or reproducing pictures or designs which consists in forcing successive colors through a screen upon a surface.

"2. The herein described method of delineating or reproducing pictures or designs containing a plurality of colors, which consists in forcing each separate color through a partly blocked out screen upon a surface.

"3. The herein described method of reproducing a multicolored design which consists in forcing each separate color through a partly blocked out screen so that one color will overlay another upon a surface."

The Patent Office, on April 29, 1916, rejected all the claims quoted upon Bostwick No. 1,111,002, September, 1914, Simon (British), and

made reference to Vericel (1902) No. 708099, Burdick (1904) No. 757438, Barwolff (1877) No. 192558. The examiner wrote:

"In Bostwick it is to be noted that the several colors or parts of the screen are also blocked off so as to prevent the colors from intermingling. In the British patent it appears that the same steps are carried out as in applicants' case. A screen of wire or suitable material is marked off to indicate the outline of a certain color, whereupon the remainder of the screen is closed up with 'knotting' and the steps of printing with the prepared screen are the same as in applicants' case. While this patentee does not describe the application of several different colors, it is to be noted that the steps of the method would be a repetition of what he has described if he chose to employ his screen for multicolor work."

The applicants amended their claims, and submitted other claims which included claim 1 of the patent now in suit, but again all of the claims were rejected on the British patent to Simon heretofore cited. The examiner wrote that—

It seemed clear that in producing the several "tones of the same color the patentee (Simon) uses a single screen and proceeds in every way like applicants. The fact that he describes this procedure only in connection with protection of different tones of the same primary color is not material, for obviously with this disclosure available it is not invention to employ the same series of steps to get a second color overlaid upon the first; said two colors not having the relation of 'tones of the same color.' While the patentee does not refer to any embossing effect or obtain clean-cut marginal lines between adjacent colors, it seems obvious that these results must follow as soon as the steps of the process appear to be just the same. Greater or less embossing effect would depend largely upon the consistency of the ink or color employed."

In response to the letter of rejection, amendments by way of two new claims were submitted, 1 and 10. Claim 1 of the patent was renumbered as 2, and claim 10 was submitted. What was then numbered as claim 9 (now claim 8 of the patent), as previously drawn, was restricted by the substitution of the words "said screen an outline for," instead of the words, "a screen."

Applicants asked reconsideration of the rejection of the claims on the Simon patent, upon the ground that the disclosure by Simon was very vague and indefinite, in respect to application of the colors so as to obtain clean-cut margin lines, and was insufficient for claims for a process involving the uses of either one or a plurality of screens, or an embossed effect. In November, 1916, claims 1, 3, 9, and 10 were rejected on the patent to Simon, and also on the patent to Vericel, the ruling being that the claims were broad enough to cover a process employing a screen for each separate color, but "as already made of record, this is the process carried out in the British patent to obtain several tones of the same color, and obviously the same series of steps is carried out by Vericel in obtaining a multicolored picture." The remaining claims were allowed. Thereafter, in January, 1917, the original specification of the application was canceled and the specification of the patent, with certain changes thereafter made, was inserted. There was a renumbering of claims and claim 10 was added. Subsequently, claims 1 and 10 were erased, claim 3 became claim 2 of the patent, and claim 9 became claim 8 of the patent. In January, 1917,

when amendment was asked, applicants, by affidavit in elaboration of their contentions as to the features of difference between Simon's and their methods, set forth that Simon's stencil was constructed of chiffon and that, to obtain the embossed effect which was part of their process, it would be necessary to "scrape" color through the mesh of Simon's stencil "under heavy pressure," and that such method would be impracticable because chiffon would not stand the dragging of a rubber squeegee over it under heavy pressure. Affiants declared that Simon specifically confined his claims to the use of chiffon and knotting, but that knotting was not an article of commerce in this country; also, that chiffon has a loosely woven mesh different from bolting cloth used by applicants; also, that Simon required cleaning the screen after each impression, but that in the operation of their process the use of the squeegee automatically cleans all color out of the meshes of the screen after each impression and prepares the stencil for the next operation. Affiants also referred to the dabbing operation spoken of by Simon as one effected by the use of a leather-covered pad for driving stiff inks, or the like, upon the face of a plate, which caused underrunning of the edges failing to produce clear-cut margin lines. Affiants emphasized the use of the squeegee in scraping color, while Simon "dabbed" the color. Affiants said that Vericel's patent had nothing in common with applicant's invention except the use of a scraper. In February, 1917, claims 1, 10, and 11, as then numbered, were rejected on reference to Simon, Vericel, and Pirkis; the examiner saying that claim 1 is not necessarily limited to the use of a single screen, but that the same process could be carried out within the terms of the claim "by the use of a screen for each separate color." On reconsideration claims 1, 10, and 11 were again rejected, the examiner holding that the language of 1 and 10 was broad enough to mean that a single screen is used for the several colors, said screen, however, being differently blocked out for each successive color. Thereafter applicants amended by canceling 1, 10, and 11 and inserting a substitute, claim 10 only, inserted by amendment of April 16, 1917. Thereafter claims 1, 10, and 11 were canceled, and claim 10 of the patent was allowed, and claim 1 of the patent (previously claim 2) took the place of canceled claim 1.

Referring to the prior state of the art, Simon in English patent No. 756, accepted July 11, 1907, for "improvements in or relating to stencils," described a method of screen preparation by stretching chiffon or like material on a cardboard or frame and tightening with blue, placing the frame and chiffon over the pattern, marking on the chiffon the register marks necessary for the repetition of the pattern, outlining the pattern on the chiffon with knotting, filling with knotting all intervening space not intended to be reproduced, and thus leaving the chiffon uncovered only where the pattern is. Simon's method of application was to place the screen on a piece of cloth and with the chiffon pressed close to it spray or daub with a soft stencil brush the color over it, till all the pattern is reproduced. He provided for cleaning and drying the screen and then using it again where one color was to be used, and if two or three are required, then "a screen is made

for each color and each color is treated separately as in the one color description given."

"It is desirable," wrote Simon, "that when three tones of the same color make a form, then the whole of that form is placed on the first screen of that color; the form less the first tone on the second screen of that color; the form, less the first and second tones on the third screen of that color."

The claims of Simon in the described process were: Knotting, making of a stencil by painting over stretched chiffon, or like material, the outline of the pattern direct, and filling in all the ground or intervening space between the ornament not intended to be reproduced, with knotting. Simon also claimed as an article of manufacture "a stencil, viz., a frame covered with chiffon, or like material, tightly stretched and painted over with knotting only where the pattern is not intended to be reproduced."

In 1902 Vericel patented a means for decorating fabrics, using stencils of a stretched composite fabric with open meshes preferably of loosely woven fibers so as to have comparatively large meshes known as "bolting cloth." He forced color through his screen. Barwold patent (1877) was for an improvement in the processes of ornamenting wood. He used stencil patterns, coloring substances, and produced darker tints by superposing colors at proper places, one over the other, until the darker shade was obtained where needed. His one claim was for the use of the pasteboard pattern in his process.

Pirkis (1907) in his patent apparatus for stenciling design brushed paint over the stencil, using flaps which folded, leaving a portion of the design on the card as each flap was used with application of the paint to complete the design. I attach little importance to the Pirkis reference, but gather from the other references that the forcing of color through a single screen long antedates any invention of the patent in suit. Simon shows that a screen partly blocked out after each color-run could be used, while Vericel distinctly claims the use of laying color upon color. Witnesses for the plaintiff say that in the process as described by the witnesses the color after each run of color is left to dry and then another color-run is made through the screen on top of the dried color, the screen having been first washed to remove the paint of the completed run and the area in the screen is reduced by blocking out. But I cannot see that such a process has the elements of novelty upon which patent can be sustained. The use of a painted ground rather than of a plain surface for a run of color and the use of the painted surface for the use of a succeeding screen, by methods commonly known for the laying on of color-runs, is not novelty. The several steps being old in the art, bringing them into positions to produce their own results cannot support a patent claim. Again, the making of an outline for a design on a single screen is the equivalent of making the same outline on different screens. When the single screen has been blocked out, it has no value as to previously blocked out operations unless the screen be cleaned of what are spoken of as stop-outs. Each stop-out of a single screen makes it available for only one stencil at a time.

The argument that a single screen reduced by successive stop-outs enables a better allignment for register than can be had by the use of a plurality of screens is not persuasive. Plaintiffs contend in this litigation that their patent enables them to use a plurality of screens. Obviously, the tracing of the design through the bolting cloth over the picture to be copied is not invention.

There is no force in the suggestion that the use of the word "knotting" is not clear, for plainly it signifies a quick drying substance used for the purpose of stopping-out and generally used for such purpose. Nor are the plaintiffs on firm foundation when they say that bolting cloth is essentially different in its interlocking mesh from chiffon. The one may be stronger than the other, but each is a cross-weave of cloth, and through each can be forced colors dependent upon the consistency of the coloring material. In the British patent a dabbing operation is described 'as very distinct from the use of a squeegee; but if the dabber is used as it is for driving stiff inks on a plate and the squeegee is used for forcing the material used by the patentees through bolting cloth, there is no substantial difference. Vericel describes the use of a scraper very much as the patentees describe theirs.

The contention that there is a difference between a method in which a series of operations is performed upon a plurality of screens and one in which the same series of operations is performed upon a single screen is not sound, for the only difference in the use of the single screen instead of the plurality is that the same piece of cloth is used for an initial screen and successively in series for subsequent screens. If a plurality is used, each screen is always available so long as it lasts for use. Stress is laid upon the point that the use of a single screen affords a better register in the work of production. But it is in evidence exact registry is not necessary in actual practice, and that with the multiple screen as good a job can be done as with a single screen.

My conclusion is that the patent should not be sustained as valid.